UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOHN WILSON, on behalf of himself
and all others similarly situated,

       Plaintiff,

     v.

       Case No. 2:22-cv-861
       JUDGE EDMUND A. SARGUS, JR.
       Magistrate Judge Kimberly A. Jolson

ANCESTRY.COM LLC, et al.,

       Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendants Ancestry.com Operations Inc., Ancestry.com Inc., and Ancestry.com LLC's (collectively, "Ancestry") Motion to Dismiss Class Action Complaint (ECF No. 13), Plaintiff John Wilson's Opposition to Ancestry's Motion to Dismiss (ECF No. 29), and Ancestry's Reply (ECF No. 33). For the reasons set forth below, the Court **DENIES** Ancestry's Motion to Dismiss. (ECF No. 13.)

### I. BACKGROUND

On February 21, 2022, Plaintiff John Wilson, on behalf of himself and all others similarly situated, filed this putative class action alleging that Ancestry, which owns www.ancestry.com, used Wilson and the proposed class members' names and personas to promote paid subscriptions to the Ancestry website without their consent. (Compl. ¶ 1, ECF No. 1.) According to the Complaint, a paid subscription to Ancestry.com provides subscribers with access to a wide range of services, such as access to Wilson and the putative class members' yearbook photos, personal information, and more than 18 billion records worldwide, as well as multiple tools that allow users to "[g]row a family tree." (*Id.* at ¶ 10.)

Wilson identifies three advertising techniques in which Ancestry, without Wilson's consent, uses his persona to encourage viewers to subscribe to Ancestry's services. First, via Ancestry's publicly accessible landing page, any visitor may search for any person by name and location. (Compl. ¶ 6, ECF No. 1.) Upon returning a search for Wilson or any proposed class member, Ancestry retrieves a list of corresponding yearbook photographs accompanied by promotional text urging the visitor to "Sign Up Now" for a subscription. (*Id.*) The promotional text further encourages purchase of a subscription by promising that "There's more to see" about the searched individual, including higher-resolution photographs and additional personal information, such as the individual's city of residence, estimated age, and high school graduation year. (*Id.*)

As for the second advertising technique, Ancestry sends promotional emails and onsite messages to users who have not yet subscribed and who may be related to Wilson or a proposed class member. (*Id.* at ¶¶ 7, 38.) Wilson alleges that these emails and messages use his and the proposed class members' names and identities, referencing one promotional email with the subject line "What should you explore next for [proposed class member]?" (*Id.*) The body of the email provides a link, and if the recipient follows the link, he or she is taken to a webpage asking him or her to subscribe to Ancestry.com. (*Id.*)

In the third advertising technique, Ancestry allows users to enroll in a two-week free trial membership during which users have full access to Ancestry's services. (*Id.* at ¶ 8.) These users may search for, view, print, and share Wilson and other proposed class members' personal information. (*Id.*) As alleged, Ancestry's "sole purpose" in granting free-trial users access to Wilson and the proposed class members' personal information is to solicit the purchase of paid memberships. (*Id.*)

2

Wilson is a resident of Morgan County, Ohio. (*Id.* at ¶ 26.) He is not a subscriber to any of Ancestry's products or services, nor has he ever visited Ancestry.com. (*Id.* at ¶ 27.) Ancestry uses at least two photographs depicting Wilson to advertise subscriptions to Ancestry.com. (*Id.* at ¶ 32.) In all three advertising techniques detailed above, Ancestry uses Wilson's name and photograph. (*Id.* at ¶¶ 33-39.) Wilson did not give consent to Ancestry to use his name, photograph, likeness, or persona in any way. (*Id.* at ¶ 30.)

Wilson brings this putative class action against Ancestry alleging (1) misappropriation of his and the putative class members' personas in violation of Ohio's right of publicity statute, Ohio Rev. Code § 2741, and (2) invasion of privacy by means of appropriation under Ohio common law.[1] (*Id.* at ¶¶ 55-66.)

## II. LEGAL STANDARD

### A. 12(b)(2)

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss for lack of personal jurisdiction. "The party seeking to assert personal jurisdiction bears the burden of demonstrating that such jurisdiction exists." *Schneider v. Hardesty*, 669 F.3d 693, 697 (6th Cir. 2012) (quoting *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002)) When a court considers a motion to dismiss pursuant to Rule 12(b)(2) without an evidentiary hearing, as the Court does here, it must consider the pleadings and affidavits in the light most favorable to the plaintiff. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). In such an instance, the

---

[1] Wilson refers to his common law claim as a "[t]ort of appropriation of a name or likeness," citing to *Zacchini v. Scripps-Howard Broadcasting Co.*, 351 N.E.2d 454, 458 n. 4 (Ohio 1976). (Compl. ¶ 64, ECF No. 1.) This Court and the Sixth Circuit have previously referred to this claim as an "invasion of privacy," and therefore, in the interest of maintaining consistency, the Court will do so here. *See Roe v. Amazon.com*, 170 F. Supp. 3d 1028, 1034 (S.D. Ohio 2016) (referring to plaintiff's claim as "common law invasion of privacy by means of appropriation," relying on *Zacchini*); *Bowling v. Bowling*, No. 91-5920, 1992 U.S. App. LEXIS 18505, at *12 (6th Cir. 1992) ("one who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy.") (Quoting Restatement (Second) of Torts § 652C cmt. a).

plaintiff "need only make a prima facie showing of jurisdiction." *Bird*, 289 F.3d at 871 (quoting *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002)). And the court may not weigh "the controverting assertions of the party seeking dismissal." *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 899 (6th Cir. 2017) (quoting *Theunissen v. Matthews*, 935 F.2d at 1459).

## B. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of actions that fail to state a claim upon which relief can be granted. While Rule 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief," in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 697 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (clarifying plausibility standard articulated in *Twombly*). Further, "[a]lthough for purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quoting *Twombly,* 550 U.S. at 555) (internal quotations omitted).

## III. DISCUSSION

Ancestry asserts five grounds upon which the Court should dismiss Wilson's Complaint: (1) the Court lacks personal jurisdiction over Ancestry, (2) Wilson lacks Article III standing, (3) Wilson cannot state a plausible claim under Ohio's right of publicity statute or under Ohio common law, (4) section 230 of the Communications Decency Act forecloses Wilson's claims, and (5) the

Copyright Act preempts Wilson's claims. (Mot. to Dismiss, ECF No. 13, p. 2.) The Court addresses each ground in turn.

## A. Personal jurisdiction over Ancestry

Wilson argues that Ancestry's contacts with Ohio giving rise to this action establish specific personal jurisdiction; the Court agrees. (Pl. Opp'n, ECF No. 29, pp. 3-6.)

For the court to exercise specific jurisdiction over the defendant, "[t]he plaintiff's claims 'must arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1025 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017)). Further, "[a] federal court sitting in diversity may not exercise jurisdiction over a defendant unless courts of the forum state would be authorized to do so by state law—and any such exercise of jurisdiction must be compatible with the due process requirements of the United States Constitution." *Int'l Techs. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 391 (6th Cir. 1997) (citation omitted). "Under Ohio law, personal jurisdiction over non-resident defendants is available only if (1) the long-arm statute confers jurisdiction and (2) jurisdiction is proper under the Federal Due Process Clause."[2] *Conn v. Zakharov*, 667 F.3d 705, 712 (6th Cir. 2012) (citing *Kauffman Racing Equip., L.L.C. v. Roberts*, 930 N.E.2d 784, 790 (2010); *Goldstein v. Christiansen*, 638 N.E.2d 541, 543 (1994)).

---

[2] Because the reach of Ohio's long-arm statute is unclear—namely, whether the statute is coterminous with the United States Constitution—the Court presumes that Wilson must make a prima facie showing of jurisdiction under both prongs. *See QFS Transp., LLC v. Huguely*, No. 1:21-cv-00769, 2022 U.S. Dist. LEXIS 95329, at *10-12 (S.D. Ohio May 27, 2022) (discussing implications of recent amendment to Ohio's long-arm statute and noting conflict among district courts as to whether the amended statute is now coterminous with federal constitutional limits); *AmaTech Grp. Ltd. v. Fed. Card Servs., LLC*, No. 1:21-cv-406, 2022 U.S. Dist. LEXIS 1655, at *10-13 (S.D. Ohio Jan. 5, 2022) (same). In other words, rather than collapsing the analysis of Ohio's long-arm statute's specific jurisdiction test into the federal standard, the Court will treat each test separately.

### a. Ohio's long-arm statute[3]

Under Ohio's long-arm statute, a court may exercise specific personal jurisdiction over a cause of action "arising from" the defendant "[c]ausing tortious injury by an act or omission in this state . . . ." Ohio Rev. Code § 2307.382(A)(3); Ohio Civ. R. 4.3(A)(3); *Estate of Poole v. Grosser*, 731 N.E.2d 226, 229 (1999) (noting that the court must determine whether "Ohio's long-arm statute, R.C. 2307.382, and the complementary civil rule, Civ. R. 4.3, confer jurisdiction"). Likewise, Ohio's Civil Rule 4.3 provides for service of process on a nonresident defendant under the same circumstances. Ohio Civ. R. 4.3(A)(3) (permitting service based on the defendant "[c]ausing tortious injury by an act or omission in this state…."). In other words, "a court may exercise personal jurisdiction over a party who causes tortious injury by an act or omission in Ohio." *M.W. v. D.M.*, 2018-Ohio-392, ¶ 14 (Ct. App.).

The Court may properly exercise personal jurisdiction over Ancestry under Ohio's long-arm statute. At the outset, the Court notes that an invasion of privacy is unambiguously a tort. *See James v. Bob Ross Buick, Inc.*, 855 N.E.2d 119, 122 (Ohio Ct. App. 2006) ("Ohio has adopted the *tort* of misappropriation of the name or likeness of another as propounded by the Restatement.") (Emphasis added) (citing *Zacchini v. Scripps-Howard Broadcasting Co.,* 351 N.E.2d 454 (Ohio 1976)); *Bosley v. WildWetT.com*, 310 F. Supp. 2d 914, 919 (N.D. Ohio 2004) ("At common law, invasion of the right to privacy is a *tort*.") (Emphasis added).

Wilson's Complaint alleges that Ancestry caused tortious injury in Ohio through Ancestry's invasion of Wilson's privacy by means of appropriation. (Compl. ¶¶ 63-65, ECF No. 1.) The Complaint states that Ancestry copied Wilson and the proposed class members' "personal

---

[3] Ancestry's Motion to Dismiss does not challenge the Court's jurisdiction under Ohio's long-arm statute, focusing its attention instead on the propriety of the Court exercising personal jurisdiction under the Federal Due Process Clause.

information from yearbooks or other sources located in Ohio"; that Ancestry displayed their "names and photographs in advertisements expressly directed at Ohio residents," and Ancestry failed "to obtain required consent from Class members in Ohio[.]" (*Id.* at ¶ 21.) Thus, Ancestry has "caused tortious injury by an act or omission" within Ohio; As such, the Court finds that Ancestry is subject to specific personal jurisdiction under R.C. § 2307.382(A)(3).

### b. Due process

Despite finding that personal jurisdiction is proper under Ohio's long-arm statute, the Court still must determine whether the Court's exercise of personal jurisdiction over Ancestry is consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. This inquiry asks the Court to examine whether Ancestry "possesses such minimum contacts with [Ohio] that the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'" *Theunissen*, 935 F.2d 1454, 1459 (6th Cir. 1991) (quoting *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945)). This standard, as clarified by the Sixth Circuit, permits specific jurisdiction over Ancestry only if Ancestry's contacts with Ohio satisfy three conditions:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Bird*, 289 F.3d 865, 874 (6th Cir. 2002) (quoting *Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)). Ancestry's contacts, as alleged in Wilson's Complaint, satisfy all three conditions.

### i.  Purposeful availment

Ancestry argues that Wilson's Complaint fails to satisfy the first factor because Wilson only alleges the following:

> Ancestry (a) hosted a universally-accessible website, including to those who happened to reside in Ohio; (b) "advertise[d]" its services through the same universally-accessible website; and (c) plaintiff and some putative class members, who happen to be Ohio residents, had their names and images "misappropriated."

(Mot. to Dismiss, ECF No. 13, p. 12.) After providing this summary of Wilson's allegations, Ancestry directs the Court's attention to several cases within this Circuit holding that the mere maintenance of a website accessible from within the forum, without more, does not constitute purposeful availment. (*Id.* at pp. 12-13 (citing, *inter alia*, *See, Inc. v. Imago Eyewear Pty, Ltd.*, 167 F. App'x 518, 523 (6th Cir. 2006).)

This Court agrees with Ancestry's statement of the law: "Courts generally agree that maintaining a website accessible from within the forum state is not, by itself, sufficient to establish specific personal jurisdiction." *Stewart v. M & M Headgear, Inc.*, No. 5:14 CV 857, 2015 U.S. Dist. LEXIS 39720, at *11 (N.D. Ohio Mar. 27, 2015). But Ancestry misreads Wilson's Complaint.

"The operation of an Internet website can constitute the purposeful availment of the privilege of acting in a forum state under the first *Mohasco* factor 'if the website is interactive to a degree that reveals specifically intended interaction with residents of the state.'" *Bird*, 289 F.3d 865, 874 (6th Cir. 2002) (quoting *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 890 (6th Cir. 2002) (finding that defendants met the purposeful availment requirement where they maintained a website on which Ohio residents could register domain names and accepted the business of more than 4,000 Ohio residents)). Ancestry.com, as Wilson alleges, is such a website. Wilson's Complaint states that Ancestry displays Ohio yearbook photographs in advertisements

directed to Ohio residents, noting that these photographs originated from yearbooks or other sources located in Ohio. (Compl. ¶ 21, ECF No. 1.) The Complaint further notes that Ancestry has a database containing millions of records about Ohio residents (*Id.* at ¶¶ 20, 48), and Ancestry allegedly uses some of these records (*i.e.*, yearbook photographs) to solicit subscriptions by promising users, such as Wilson and the proposed class members' families, the ability to create and grow a "family tree"—a family tree that reasonably might include Ohio residents. (*Id.* at ¶¶ 21, 34-36; Pl. Opp'n, ECF No. 29, p. 4.)

Ancestry, however, argues that its advertisements using Wilson and the proposed class members' yearbook photos are not "targeted to users located in Ohio" because any user, including those residing outside of Ohio, can view the advertisements as long as they submit the appropriate search criteria. (Mot. to Dismiss, ECF No. 13, p. 13-14.) The Court is not persuaded, and, indeed, this same argument has been rejected by other courts. *See Sessa v. Ancestry.com Operations Inc.*, 561 F. Supp. 3d 1008, 1025-1026 (D. Nev. Sept. 16, 2021); *Bonilla v. Ancestry.com Operations Inc.*, 574 F. Supp. 3d 582, 590 (N.D. Ill. Dec. 7, 2021). Analysis from the *Sessa* decision is particularly persuasive on this point:

> Ancestry contends it cannot be charged with knowledge that it aimed its activities at Nevada.
>
> The Court disagrees. Plaintiffs allege that Ancestry's database includes 1.7 million individual records from yearbooks of Nevada schools. Even if a substantial percentage of the individuals in Ancestry's database have moved from the state, it strains credulity that Ancestry would not know that, by creating a commercial database of many millions of Americans, over one million of whom went to school in Nevada, a substantial market for the database would be persons residing in Nevada. Ancestry has sought to build a Database with nationwide appeal by allegedly collecting as many yearbooks as possible from across the country. *Ancestry intentionally targeted all fifty states in doing so.*

*Sessa*, 561 F. Supp. 3d 1008, 1025-1026 (D. Nev. Sept. 16, 2021) (emphasis added) (internal citations omitted). The *Sessa* plaintiffs' allegations that Ancestry created a commercial database

9

containing almost 2 million individual records from yearbooks of Nevada schools were critical to the court's finding that Ancestry deliberately targeted Nevada residents. Those same allegations, but tailored to Ancestry's activities in Ohio, are applicable here. (*See* Compl. ¶¶ 20-21, 48.) And this Court, like the *Sessa* court, reaches a similar conclusion: Wilson's allegations establish that Ancestry intentionally targeted Ohio residents with its advertisements. Ancestry's targeted advertisements demonstrate "specifically intended interaction with residents of [Ohio]," thus constituting "purposeful availment of the privilege of acting in a forum state[.]" *See Bird*, 289 F.3d 865, 874 (6th Cir. 2002).

### ii. Arising from Ancestry's activities in Ohio

Next, the Court must answer whether Wilson's causes of action arise from Ancestry's contacts with Ohio. This is a "lenient standard" that asks "whether the causes of action are related to or connected with the defendant's contacts with the forum state." *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007) (citations omitted). Wilson's Complaint satisfies this lenient standard.

As the Court discussed above, Wilson's Complaint alleges that his causes of action arise from Ancestry's non-consensual use of Wilson's name and yearbook photographs, which originated in Ohio, to solicit subscriptions from Ohio residents. These allegations, when viewed under the "lenient standard" applicable to the "arising from" criterion, lead the Court to conclude that Wilson's claims arise from Ancestry's activities in Ohio. *See Bird*, 289 F.3d 865, 875 (6th Cir. 2002).

### iii. Reasonableness

The last due process consideration requires that the exercise of jurisdiction be reasonable in light of the alleged connection between Ancestry and Ohio. *See id.* Because Wilson has satisfied

the first two conditions of the due process analysis, "[a]n inference arises that the third factor is satisfied[.]" *Id.* To overcome this inference, Ancestry must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1168 (6th Cir. 1988) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). Courts may consider, among other things, the defendant's burden, the forum state's interest, and the plaintiff's interest in obtaining relief. *Bird*, 289 F.3d 865, 875 (6th Cir. 2002).

Here, Ancestry's motion does not address the "reasonableness" factor. But even if Ancestry had argued that it would face a burden having to defend this action in Ohio, it would not be unreasonable given that Ancestry allegedly targeted Ohio residents with the offending advertisements. Ohio also has an interest in protecting the publicity rights of its citizens, and Wilson and those in the proposed class, who are all Ohio residents, have an interest in obtaining relief.

For all of the foregoing reasons, the Court finds that Wilson has established a prima facie case that Ancestry is subject to specific jurisdiction in Ohio.

## B. Standing

Ancestry also asserts that Wilson lacks Article III standing to pursue his statutory and common law claims. This assertion is without merit.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting U.S. CONST., art. III, § 2). This limitation requires the party seeking relief to have standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-04 (1998). To have standing under Article III, the party must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct

11

of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The plaintiff bears the burden of establishing each element, and the district court must accept all factual allegations in the complaint as true. *Id.*; *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012).

Ancestry's motion only takes issue with the first element—that Wilson suffer an injury in fact. This element requires Wilson's injury be "concrete"—*i.e.*, "real, and not abstract." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). In determining whether an injury is concrete, "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* (quoting *Spokeo v. Robins*, 578 U. S., 330, 341 (2016)). This inquiry "asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.*

Here, accepting as true the allegations in the Complaint, Wilson has adequately established injury in fact for his Ohio right of publicity claim under R.C. § 2741 and his analogous common law invasion of privacy claim. *See James*, 855 N.E.2d 119, 122 n.2 (2006) (noting also that Ohio's codified right of publicity does not supplant common law invasion of privacy). Wilson alleges injury from Ancestry's misappropriation of his persona for the purpose of promoting paid subscriptions. (Compl. ¶¶ 18, 21-22, 44, 61, ECF No. 1.) Such an injury has traditionally been recognized at common law. *See Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 622 (6th Cir. 2000) ("The right of publicity is a creature of state common law and statute and originated as part of the common-law right of privacy.") (Citing *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562 (1977); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 930 (6th Cir. 2003) (citing approvingly to Restatement (Third) of Unfair Competition, § 46, cmt. a, which notes that both statute and common law recognize the right of publicity). Accordingly, taking Wilson's allegations as true

12

that Ancestry, without Wilson's consent, used his persona for a commercial purpose in violation of Ohio's right of publicity, Wilson suffered an injury in fact.

Ancestry does not challenge the remaining two standing elements—causation and redressability, nor should it. Both elements are satisfied here. Wilson's Complaint alleges that Ancestry used Wilson and the proposed class members' personal information and their yearbook photos to promote paid subscriptions to Ancestry's website without their consent, violating their publicity rights. (Compl. ¶ 1, ECF No. 1.) A favorable ruling would redress their injury by compensating them for the use of their personas in advertising and/or enjoining Ancestry from such further use. As such, Wilson and the proposed class have standing to bring their claims before this Court.

### C. Wilson Properly Pleads His Claims

Ancestry also argues that Wilson's Complaint fails to plausibly state his right of publicity claims. As an initial matter, the Court will briefly set forth Wilson's claims. Wilson first claims a violation of his right of publicity under R.C. § 2741. Under Ohio's right of publicity statute, "a person shall not use any aspect of an individual's persona for a commercial purpose" unless "[t]he person first obtains written consent[.]" Ohio Rev. Code § 2741.02(A)-(B). "[P]ersona" means "an individual's name, voice, signature, photograph, image, likeness, or distinctive appearance, if any of these aspects have commercial value." Ohio Rev. Code § 2741.01(A). As for Wilson's analogous common law claim, a defendant is subject to liability when he appropriates to his own use or benefit the name or likeness of another, and the name or likeness has commercial or other value. *Roe v. Amazon.com*, 714 F. App'x 565, 568 (6th Cir. 2017).

The Court also notes that because "case law on the [right of publicity] is exceedingly rare," and due to the interest of maintaining nationwide uniformity on this right, "courts typically give

attention to the entire available body of case law when deciding right of publicity cases." *Landham*, 227 F.3d 619, 622-23 (6th Cir. 2000).

Returning to Ancestry's motion, Ancestry provides three bases for arguing that Wilson's Complaint does not plausibly plead his claims: (1) Wilson fails to allege that his name or likeness had any commercial value when misappropriated, a requirement of both of his claims; (2) the alleged "use" of Wilson's name and image were nothing more than incidental to Ancestry's operations, thus precluding Wilson's claims; and (3) Wilson's statutory claim falls within multiple statutory exemptions. (Mot. to Dismiss, ECF No. 13, pp. 22-25.) The Court will address each basis in turn.

### a. Wilson plausibly alleges commercial value

Ancestry argues that Wilson has failed to plausibly allege that his name and likeness has any commercial value. Ancestry argues that Wilson alleges "only that Ancestry 'used' his name and image to preview the existence of his yearbook record on its website," and that any alleged value from this use came from "Ancestry's ability to offer access to his and other public records," which "is not enough." (*Id.* at 20 (citing *Vinci v. Am. Can Co.*, 69 Ohio 591 N.E.2d 793, 794 (Ohio Ct. App. 1990).)

Ancestry's reliance on *Vinci* requires closer examination. The plaintiff in *Vinci*, an Olympic gold medalist representing a class of Olympic athletes, alleged that defendants violated his right of publicity by using his name and likeness on a series of promotional disposable drinking cups sold as Dixie Cups. *Vinci*, 69 Ohio 591 N.E.2d 793, 793 (Ohio Ct. App. 1990). In addressing plaintiff's sole assignment of error—that the trial court erred in granting summary judgment in favor of defendants—the court began by setting forth the standard for invasion of privacy by appropriation:

14

> The fundamental wrong is the appropriation of a person's name, likeness, or identity for one's own benefit whether or not that benefit is pecuniary.
>
> . . .
>
> The value of the plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities; nor is the value of his likeness appropriated when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity.
>
> . . .
>
> *It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded.* The fact that the defendant is engaged in the business of publication, for example of a newspaper, out of which he makes or seeks to make a profit, is not enough to make the incidental publication a commercial use of the name or likeness.

*Id.* at 793-94 (cleaned up) (emphasis added). Following this recitation of the governing law, the court affirmed the trial court's judgment, holding that defendants' references to the Olympic athletes were "purely informational," "merely incidental," and therefore unactionable. *Id.* at 794.

Ancestry's attempt to liken its operations to those of the defendants in *Vinci* is misplaced. *See id.* at 794. Whereas the *Vinci* defendants' use of the Olympic athletes' name and likeness was "purely informational," Ancestry's alleged use of Wilson and the proposed class members' personas "was for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness"—which *is* enough. *See id.* at 794. Ancestry's advertisements directly use Wilson's persona when soliciting paid subscriptions. Ancestry publicly displays Wilson's yearbook photo alongside an on-screen message promising the user that "[t]here's more to see" about Wilson while also prompting the user to "Sign Up Now" for a paid subscription. (Compl. ¶¶ 34-35, ECF No. 1.) Ancestry also provides access to Wilson's persona through the two-week "free trial" and informs users that they must purchase a paid membership if they wish to continue accessing Wilson's personal information. (*Id.* at ¶¶ 39-40.) And Ancestry uses Wilson's persona when sending targeted promotional emails to potential

subscribers. (*Id.* at ¶ 37-39.) Ancestry's practice of using Wilson's persona to solicit paid subscriptions plausibly demonstrates that Wilson's persona has commercial value.

Other courts, including the Sixth Circuit, agree. *See Landham*, 227 F.3d 619, 624 (6th Cir. 2000) ("The defendant's act of misappropriating the plaintiff's identity, however, may be sufficient evidence of commercial value."); *Kellman v. Spokeo, Inc.*, No. 3:21-cv-08976-WHO, 2022 U.S. Dist. LEXIS 71985, at *19 (N.D. Cal. Apr. 19, 2022) (applying Ohio law) (finding that plaintiff adequately pleaded commercial value "because [defendant] uses [plaintiff's] persona for commercial gain—that is, to incentivize people to subscribe—it reasonably implies that his persona does have at least some commercial value"); *Kolebuck-Utz v. Whitepages Inc.*, No. C21-0053-JCC, 2021 U.S. Dist. LEXIS 77300, at *3-5 (W.D. Wash. Apr. 22, 2021) (applying Ohio law) (holding that plaintiff established that her persona has commercial value where defendant used plaintiff's name and identifying information to entice users to purchase defendant's subscription service).

All told, Wilson's Complaint plausibly alleges that there is some value in associating Ancestry.com with his identity; as such, Wilson has adequately alleged that his persona has commercial value.

### b. Ancestry's use of Wilson's persona was not incidental

Ancestry also argues that Wilson's Complaint demonstrates that Ancestry's use of Wilson's name and likeness was merely incidental, which is insufficient for a right of publicity claim.

Where the defendant's use of the plaintiff's name or likeness is incidental, the plaintiff does not have an actionable right of publicity claim. *Roe*, 714 F. App'x 565, 568 (6th Cir. 2017) (citing *Vinci*, 591 N.E.2d 793, 794 (Ohio Ct. App. 1990)). To be more than incidental, "the

Defendant must appropriate the name or likeness of another for the reputation, prestige, social or commercial standing, public interest, or other values associated with that likeness." *Stringer v. Richard*, No. 4:21-cv-00632, 2022 U.S. Dist. LEXIS 149572, at *11 (N.D. Ohio Aug. 19, 2022).

Here, as explained in the previous subsection, Ancestry appropriated Wilson's name and likeness for its commercial value in promoting paid subscriptions. Indeed, Wilson's image and personal information were central to Ancestry's advertising materials. And other courts have reached the same conclusion on similar facts. In *Kellman*, the Northern District of California rejected defendant's argument that its use of plaintiffs' names and likenesses in online advertisements was merely incidental. 2022 U.S. Dist. LEXIS 71985, at *28. There, the defendant advertised its website by displaying "teaser profiles" of individuals that included a variety of personal information and sometimes photographs, and if a user purchased a subscription, the user would have access to the "full profile" of the individual. *Id.* at *3-4. In holding that it was plausible that defendant's use of plaintiffs' personal information was more than incidental, the court stressed that "[defendant's] business model depends on using the names, information, and likenesses of average people to entice others to subscribe to its services." *Id.* at *28-29.

The Western District of Washington reached the same conclusion in *Kolebuck-Utz*, 2021 U.S. Dist. LEXIS 77300 (W.D. Wash. Apr. 22, 2021). In *Kolebuck-Utz*, the defendant owned and operated a website selling background reports and monthly subscription services to access such reports. *Id.* at *1. To entice users to subscribe, defendant allowed users to search for a person using that person's name and then defendant provided access to a free preview of the searched person's background report. *Id.* at *1-2. Upon viewing the free report, defendant's website prompted users to click on "View Full Report," "Unlock Full Report," or "Sign Up," all of which invited the user to purchase a monthly subscription. *Id.* at 2. Plaintiff alleged that defendant used her name and

likeness in its free previews and advertisements to "entice users to purchase [defendant's] services." *Id.* In focusing on defendant's use of plaintiff's name to entice users to purchase defendant's product, the court rejected any suggestion that defendant's use was merely incidental. *Id.* at 5.

The *Sessa* court, facing a complaint largely mirroring the one before this Court, also indicated that Ancestry's use of the plaintiffs' names and likenesses was more than incidental. 561 F. Supp. 3d 1008 (D. Nev. Sept. 16, 2021). In *Sessa*, Ancestry argued for dismissal of plaintiffs' statutory right of publicity claims based upon Nevada's commercial sponsorship exemption. 561 F. Supp. 3d at 1028-29. This exemption precludes a right of publicity claim if the defendant's commercial use of the plaintiff's persona "is contained in material which is commercially sponsored but the use is not directly connected with the commercial sponsorship." Nev. Rev. Stat. Ann. § 597.790(2)(A). The Court rejected Ancestry's assertion that its use of Plaintiffs' names and images was "incidental to any commercial sponsorship," finding that:  (1) Ancestry's use of Plaintiffs' names and likenesses in its promotional emails was "directly connected" to Ancestry's advertising; and (2) Ancestry's use of Plaintiffs' names and images within the trial access period, which indicated that Ancestry was "trading off the value of customers searching for Plaintiffs' names in order to entice them into purchasing a subscription," was "directly connected to Ancestry's commercial sponsorship." *Sessa*, 561 F. Supp. 3d at 1030.

Bearing in mind the standard articulated in *Roe* and *Stringer*, and against the backdrop of multiple decisions pointing in the same direction, this Court finds that Ancestry's use of Wilson's persona, as alleged in his Complaint, is more than incidental—that is, Ancestry's appropriation of his persona for the purpose of promoting paid subscriptions establishes Ancestry's deliberate, *and not incidental*, use of Wilson's persona.

Before concluding this section, the Court will clarify an issue raised in Ancestry's brief: whether Ohio's right of publicity has a "false endorsement" or "support" element. Ancestry takes the position that its use of Wilson's persona is incidental unless the use suggests Wilson "uses, supports, or promotes" Ancestry. (Mot. to Dismiss, ECF No. 13, pp. 23-24; Def. Reply, ECF No. 33, pp. 11-12.) In other words, Wilson must show that Ancestry used his persona in a way that suggests Wilson "uses, supports, or promotes" Ancestry's products; otherwise, Ancestry's use of his persona is merely incidental.

Ancestry's position neither comports with R.C. § 2741 nor the case law interpreting Ohio's right of publicity. Beginning with the statute, it prohibits the "use [of] any aspect of an individual's persona for a commercial purpose" without "written consent." Ohio Rev. Code § 2741.02. Notably absent from this statute is any language requiring that plaintiff impliedly use, support, or endorse defendant's good or service. And R.C. § 2741.02(A)(6) suggests there is no "false endorsement" requirement; this provision exempts from liability any use of a persona "protected by the First Amendment to the United States *as long as the use does not convey or reasonably suggest endorsement by the individual whose persona is at issue*." Ohio Rev. Code § 2741.02(A)(6) (emphasis added). If R.C. § 2741 already imposes a false endorsement requirement, then this carve out would be mere surplusage. Put differently, it would be unnecessary to include this language because any use of an individual's persona that does not convey or reasonably suggest endorsement would already fall outside the statute.

Next, Ohio case law confirms the Court's understanding of Ohio's right of publicity. *See Landham*, 227 F.3d 619, 624 n.1 (6th Cir. 2000) ("the right of publicity isn't aimed at or limited to false endorsements….") (quotation omitted); *Parks v. LaFace Records*, 329 F.3d 437, 460 (6th Cir. 2003) ("publicity rights offer substantially broader protection than laws preventing false

endorsement") (quotation omitted); *Bosley*, 310 F. Supp. 2d 914, 925 (N.D. Ohio 2004) (discussing what constitutes promotional material as it relates to the infringement of one's right of publicity: "Proof that prospective purchasers are likely to believe that the identified person endorses or sponsors the user's goods or services is not required for the imposition of liability"). In sum, a plain reading of R.C. § 2741, coupled with Ohio case law, establish that a plaintiff bringing a right of publicity claim need not show that the defendant used his or her persona in a way that suggests the plaintiff "uses, supports, or promotes" the defendant's goods or services.

### c. R.C. § 2741's statutory exceptions

Ancestry also argues that its use of Wilson's persona falls within the "literary" and "historical work" exception under R.C. § 2741.09(A)(1)(a), (d) and the public affairs exception under R.C. § 2741.02(D)(1) and R.C. § 2741.09(A)(1)(b), (A)(3). (Mot. to Dismiss, ECF No. 13, pp. 24-25.) Wilson argues—and the Court agrees—that these exceptions are inapplicable to Ancestry's conduct.

### i. Ancestry's advertisements are not "literary" or "historical" works

Ancestry contends that Wilson's claim falls into the exception for a "literary work" or "historical work, . . . regardless of the media in in which the work appears or is transmitted," or an "advertisement or commercial announcement" for such a literary or historical work. (*Id.* quoting Ohio Rev. Code § 2741.09(A)(1)(a), (d).) This statutory exception does not apply at this stage.

Ancestry frames Wilson's claims challenging Ancestry's mere reproduction and distribution of his yearbook records. But Wilson's Complaint states that it is not simply Ancestry's reproduction and distribution of Wilson's yearbook photos that gives rise to his claims, but rather Ancestry's use of Wilson's persona to promote a paid subscription service offering much more than just access to information contained in Wilson's yearbook. (Compl. ¶¶ 4-8, ECF No. 1.) As

pleaded, a paid subscription not only provides access to a searched person's personal information, such as the person's "city of residence, estimated age, [and] high school graduation," but also access to the searched person's "yearbook photos, marriage records, baptism records, death certificates, divorce records, photographs of grave sites, and other[]" records. (*Id.* at ¶¶ 5-6.) Furthermore, a paid subscription provides users with "a wide range of services, including the ability to: 'Grow a family tree with exclusive search tools'; 'Connect with fellow members'; 'Access 15+ billion records' from the U.S.; 'Expand your search with 3+ billion worldwide records'; 'Find stores among 142+ million pages in the Newspapers.com Basic subscription'; 'Explore 537+ million original military records on Fold3.com'; and 'Enjoy premium support with a dedicated 1-800 number.'" (*Id.* at ¶ 10.) The crux of Wilson's Complaint is Ancestry's use of Wilson's persona to promote paid subscriptions offering a wide variety of Ancestry's products and services. Under a plain reading of Ohio's right of publicity statute, such paid subscriptions and their advertisements are neither "literary" nor "historical" works. It follows, at least at the pleadings stage, that R.C. § 2741's "literary" and "historical" work exceptions do not shield Ancestry from liability.

### ii. The public affairs exceptions do not apply

Ancestry also argues that its advertisements are exempt because they are matters of public affairs. The Court disagrees.

Ohio's right of publicity statute exempts: (1) "use of an aspect of an individual's persona in connection with any news, public affairs, sports broadcast or account"; (2) "[m]aterial that has political or newsworthy value"; and (3) "use of an aspect of an individual's persona in connection with the broadcast or reporting of an event or topic of general or public interest." Ohio Rev. Code §§ 2741.02(D)(1); 2741.09(A)(1)(b), (A)(3). Under these statutory exceptions, "use of a person's

identity primarily for the purpose of communicating information . . . is not generally actionable as a violation of the person's right of publicity." *Harvey*, 154 N.E.3d 293, 308 (Ohio Ct. App. 2020).

Here, Ancestry's motion focuses almost exclusively on answering the question of whether a yearbook falls under the public affairs exception. But Ancestry, once again, improperly frames Wilson's Complaint as arising solely from Ancestry's reproduction and distribution of Wilson's yearbook. If this were the extent of Wilson's Complaint, then the public affairs exception might be applicable—but it is not. It is Ancestry's use of Wilson's persona in connection with the *promotion of paid subscriptions*—not the reproduction and distribution of Wilson's yearbook— that gives rise to his claim. Under this framing, Ancestry's use of Wilson's persona to promote paid subscriptions cannot conceivably fall under R.C. § 2741's public affairs exceptions, thus rendering the public affairs exceptions inapplicable. *See Callahan v. PeopleConnect, Inc.*, No. 20-cv-09203-EMC, 2021 U.S. Dist. LEXIS 210857, at *51 (N.D. Cal. Nov. 1, 2021) (rejecting similar argument, stating "only reprinted yearbooks potentially have a public affairs connection; the subscription membership clearly does not"); *Martinez v. ZoomInfo Techs. Inc.*, No. C21-5725 MJP, 2022 U.S. Dist. LEXIS 66673, at *15-16 (W.D. Wash. Apr. 11, 2022) (finding California's public interest exception inapplicable where defendant used plaintiff's persona to advertise subscriptions to defendant's website despite defendant operating a website that might concern matters of public interest); *Knapke v. PeopleConnect Inc.*, 553 F. Supp. 3d 865, 878 (W.D. Wash. 2021), *rev'd on other grounds*, 38 F.4th 824 (9th Cir. 2022) (applying Ohio law in finding that the public affairs exception was inapplicable where defendant used plaintiff's persona to sell defendant's subscription service). Accordingly, the Court rejects Ancestry's argument.

**D. Communications Decency Act**

Ancestry additionally argues that it is entitled to immunity under section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1), which "immunizes providers of interactive computer services against liability arising from content created by third parties." *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 406 (6th Cir. 2014). Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Thus, to prevail on this defense, Ancestry must show that "(1) the defendant asserting immunity is an interactive computer service provider, (2) the particular information at issue was provided by another information content provider, and (3) the claim seeks to treat the defendant as a publisher or speaker of that information." *Jones*, 755 F.3d 398, 409 (6th Cir. 2014). "By contrast, a defendant is not entitled to protection from claims based on the publication of information if the defendant is 'responsible, in whole or in part, for the creation or development of [the] information." *Id.* (citing 47 U.S.C. § 230(f)(3) (defining "information content provider")).

Here, Ancestry cannot rely on section 230 for immunity because it is an information content provider of the allegedly unlawful content—that is, Ancestry is "responsible, in whole or in part, for the creation or development" of the advertisements at issue. *See id.* In *Jones*, the Sixth Circuit declared that a website provider, such as Ancestry, "helps to develop unlawful content, and thus fall within the exception to section 230, *if it contributes materially to the alleged illegality of the conduct*." *Id.* at 410 (emphasis in original) (quoting *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1167-68 (9th Cir. 2008)). A contribution is "material," if the contributing party is "responsible for what makes the displayed content allegedly unlawful." *Id.* Thus, because the alleged unlawful content consists of Ancestry's advertisements using Wilson's persona to

23

promote paid subscriptions, and Ancestry is responsible for the development of these *advertisements*, Ancestry materially contributed to the alleged unlawful content and therefore cannot use section 230 to shield itself from liability. *See Bonilla*, 574 F. Supp. 3d 582, 592 (N.D. Ill. 2021) ("Plaintiff has alleged that Ancestry collected and organized records and subsequently used Plaintiff's and the putative class members' names, likenesses, and identities in these records they curated for commercial gain"; "These allegations, taken as true, do not establish that Ancestry is a 'passive conduit' that should receive immunity under the CDA"); *Knapke*, 553 F. Supp. 3d 865, 875 (W.D. Wash. 2021) *rev'd on other grounds*, 38 F.4th 824 (9th Cir. 2022) ("The offending content is generated by [defendant] and the advertisement is not merely some passive display of content created by another entity, even if it contains a picture from a school yearbook. In this context, [defendant] is the content creator and not entitled to immunity under the CDA.").

### E. Copyright Preemption

Ancestry's final affirmative defense asserts that section 301 of the Copyright Act preempts Wilson's right of publicity claims. (Mot. to Dismiss, ECF No. 13, pp. 29-31.) There is no merit to this argument.

Section 301 of the Copyright Act preempts "all legal and equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106" and are "in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103." 17 U.S.C. § 301(a). In other words, for the Copyright Act to preempt a state-law claim, the claim must (1) involve a work within the "subject matter of copyright"—that is, the intellectual property at issue must be eligible for copyright protection; and (2) the underlying state-law claim must be "equivalent to any of the exclusive rights" within the scope of federal copyright protection. *Wright v. Penguin Random House*, 783 F.

App'x 578, 582 (6th Cir. 2019) (citing *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453-54 (6th Cir. 2001) and *Stromback v. New Line Cinema*, 384 F.3d 283, 301 (6th Cir. 2004)).

Wilson's right of publicity claims do not satisfy the subject matter requirement. Ancestry contends that Wilson's claims fall within the subject matter of copyright because his claims arise solely from Ancestry's distribution and display of the copyrighted yearbook. But this is inconsistent with Wilson's Complaint. The Complaint makes it clear that the alleged unlawful conduct was not the reproduction and distribution of Wilson's yearbook photos, but rather Ancestry's use of Wilson's name and likeness in advertisements promoting paid subscriptions to Ancestry.com. (Compl. ¶¶ 5-8, 18-19, 32-40, 50, 57, 65, ECF No. 1.) Such use does not fall within the subject matter of the Copyright Act. *See Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1004-05 (9th Cir. 2001) (holding that a "person's name or likeness" does not come within sections 102 or 103 of the Copyright Act).

Ancestry analogizes this case to the facts in *Maloney v. T3Media, Inc.*, 853 F.3d 1004 (9th Cir. 2017). (Mot. to. Dismiss, ECF No. 13, pp. 30-31; Reply, ECF No. 33, p. 18.) But Ancestry's reliance is misplaced. *Maloney* involved a suit by two former student-athletes against T3Media, which contracted with the NCAA to store, host, and license images in the NCAA Photo Library (an online photo library containing decades worth of NCAA sports history). 853 F.3d at 1007. Consumers could view thumbnails of the collection on T3Media's website, and for a fee, consumers could download a copy of a chosen photograph solely for personal use. *Id.* Some of the photos in the NCAA Photo Library captured the plaintiffs following their victory in the Division III men's basketball championship. *Id.* The plaintiffs sued T3Media for violating their right of publicity, and T3Media prevailed on its Anti-SLAPP motion strike, which argued that the Copyright Act preempted the plaintiffs' claims. *Id.* at 1008-09. The Ninth Circuit presented the

preemption issue as a question of "deciding *when* a publicity-right claim seeks to vindicate misuse of an individual's likeness, as opposed to merely interfering with the distribution, display, or performance of a copyrighted work." *Id.* at 1012-13 (emphasis in original). The court further clarified the relationship between right of publicity claims and copyright preemption, stating:

> [A] publicity-right claim may proceed when a likeness is used non-consensually on merchandise or in advertising; but where a likeness has been captured in a copyrighted artistic visual work and the work itself is being distributed for personal use, a publicity-right claim is little more than a thinly-disguised copyright claim because it seeks to hold a copyright holder liable for exercising his exclusive rights under the Copyright Act.

*Id.* at 1016. In *Maloney*, because the plaintiffs' claims "d[id] not contend that their likenesses were ever used on merchandise or in advertising," instead challenging only "the copyright holder's decision to distribute copyrighted images themselves," section 301 of the Copyright Act preempted their claims. *Id.* at 1011.

As Ancestry interprets Wilson's Complaint, Wilson's right of publicity claims do not identify a use of Wilson's name or likeness outside of Ancestry's reproduction and distribution of his yearbook information, and therefore, per *Maloney*, the Copyright Act preempts Wilson's claims. But Ancestry's position is inconsistent with Wilson's Complaint. In fact, the Ninth Circuit decision in *Downing*—a case the Ninth Circuit distinguished from the facts in *Maloney*—more closely mirrors the facts sitting before this Court.

In *Downing*, several surfers ("appellants") had brought an action asserting state law publicity claims against Abercrombie & Fitch following its publication of a subscription catalog featuring photographs of appellants competing in the 1965 Makaha International Surf Championship in Hawaii. *Downing*, 265 F.3d 994, 999-1000 (9th Cir. 2001). Abercrombie included appellants' names in the published photographs and created t-shirts like those worn by appellants in the photographs, which were for sale in the catalog. *Id.* at 1000. Abercrombie did not

26

obtain appellants' permission. *Id.* Abercrombie, framing appellants' complaint as arising from the unlawful reproduction and publication of the photographs, took the position that the Copyright Act preempted their state law claims. *Id.* at 1003. But the Ninth Circuit rejected this recasting of appellants' claims: "it is not the publication of the photograph itself, as a creative work of authorship, that is the basis of Appellants' claims, but rather, it is the use of the Appellants' likenesses and their names pictured in the published photograph." *Id.* After surveying caselaw from multiple jurisdictions, and after consulting several treatises discussing the relationship between copyright law and right of publicity claims, the court held that, despite the photographs being copyrightable, the Copyright Act did not preempt appellants' claims because the subject matter from which the claims arose was Abercrombie's unauthorized use of appellants' names and likenesses to advertise Abercrombie's products. *Id.* at 1003-04.

Here, Wilson's claims concern Ancestry's use of his name and likeness, not merely the publication of Wilson's yearbook photographs. Unlike *Maloney*, Ancestry does not simply offer a database of photos that customers may download solely for personal use. Instead, Ancestry, like Abercrombie in *Downing*, uses Wilson's name and likeness to promote Ancestry's products and services. For example, Ancestry sends promotional emails bearing Wilson's name and likeness to unsubscribed users who Ancestry believes may be related to Wilson. (Compl. ¶¶ 37-38, ECF No. 1.) Likewise, when an unsubscribed user searches for Wilson, Ancestry provides Wilson's photograph accompanied by promotional text urging the user to "Sign Up Now" and a promise that "There's more to see" about Wilson if the user purchases a paid subscription. (*Id.* at ¶¶ 6, 34.) As *Downing* and *Maloney* demonstrate, there is a distinction between a right of publicity claim that merely seeks to interfere with the publication of a copyrightable work (as in *Maloney*) and a claim that arises from the unauthorized use of the plaintiff's persona for another's commercial gain

(as in *Downing*). This case falls into the latter—that is, Wilson's Complaint alleges that Ancestry uses Wilson and the putative class members' personas to Ancestry's commercial advantage rather than simply reproducing and distributing their yearbook photographs. Accordingly, the Copyright Act does not preempt Wilson's claims. *See Sessa*, 561 F. Supp. 3d 1008, 1033 (D. Nev. Sept. 16, 2021) ("Where, as here, the platform containing a plaintiff's photograph sells information about the plaintiff and not limited rights to his image alone, the Copyright Act will not preempt a claim concerning the use of the image.").

## IV. CONCLUSION

For the reasons stated herein, the Court **DENIES** Ancestry's Motion to Dismiss. (ECF No. 13.)

**IT IS SO ORDERED.**

<u>**1/31/2023**</u>                              <u>**s/Edmund A. Sargus, Jr.**</u>
**DATE**                                    **EDMUND A. SARGUS, JR.**
                                          **UNITED STATES DISTRICT JUDGE**